UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN— NORTHERN DIVISION

ROBERT LEE,                                  Case No.: 4:15-cv-14255-LVP-PTM

    Plaintiff,                                Hon. Linda V. Parker

vs.

JOHN MILLER, et al.

    Defendants.

## Lee Exhibit 3:
## Summary of Evidence: Stewart Cover-Up

1. A picture of the illegal prescription medication began to circulate among some corrections officers which was allegedly related to Captain Stewart, the jail administrator.[1]

2. Miller testified that he assigned Shore to investigate the Stewart matter.[2]

3. Shore testified that he was assigned to investigate the Stewart matter by Cunningham.[3]

4. Shore produced a report[4] about the Stewart matter, and Stewart testified[5] the report accurately stated the facts as far as he knew, and in summary, the Shore report states the following:

    a. Stewart became aware of a jail inmate who had bad breath as a result of some type of gum disease.

    b. Stewart wanted to help the inmate and discussed the matter with one of the jail nurses.

    c. The nurse said that perhaps there is a medicated mouthwash that would help the inmate.

---

[1] Ex. 38, pictures of pharmaceutical and Stewart's dispensing instructions; Ex. 28, Gillis dep., Gillis v Miller, p. 14:25-15:1
[2] Ex. 36, Miller dep., Walraven v Miller, p. 8:14-17
[3] Ex. 37, Shore report re: Stewart pharmaceutical
[4] *Ibid.*
[5] Ex. 24, Stewart dep., Gillis v Miller, p. 8-31; *See also* Ex. 39 Stewart statement re: pharmaceutical.

    d. Stewart talked with his wife who happened to work for a dentist (Dr. Ruff) and asked her to talk to the dentist.

    e. Stewart's wife talked to the dentist and he apparently agreed to write a prescription for Peridex, for the inmate, but on suggestion of Stewart and his wife, ordered that it be put in Stewart's wife's name.

    f. All three, Stewart, his wife, and the dentist, agreed that Stewart's wife would call the Peridex prescription into the Meijer pharmacy, under the name of Kimberly Stewart, and Captain Stewart would pick up the prescription and take it to the county jail and dispense it to the inmate.

    g. In fact, Stewart did go to the Meijer pharmacy, obtained the prescription for Kimberly Stewart, took it to the jail, scratched his wife's name off the label, wrote the inmate's name on the label, made a handwritten note as to how it should be administered, left it in the unsecured kitchen area, and advised staff to let the inmate use the drug at his convenience.

5. Sgt. Shore testified that he treated the Stewart investigation different from other criminal investigations, to wit:

    a. He conducted the internal criminal investigation into the Stewart matter.[6]

    b. His criminal investigation into the Stewart matter was from January 13, 2014 to February 23, 2014.[7]

    c. Criminal investigations are normally assigned a case number.[8]

    d. The police reports in criminal cases are typically posted to the ARMS operating software used by the department since 2009.

    e. The Stewart matter warranted a police report.[9]

    f. He did not assign a case number nor enter the Stewart investigation into ARMS.[10]

---

[6] Ex. 25, Shore dep., Gillis v Miller, p. 31:13-16
[7] *Ibid.* at 10:12-18; *Ibid.* at 31:17 – 32:2
[8] *Ibid.* at 23:18-21
[9] *Ibid.* at 25:2-5
[10] The Bay County Prosecutor also kept its review of the Stewart criminal matter off from its books, contrary to standard procedure. Stroud testified that the Stewart referral to his office was not handled as a normal criminal investigation; he reported that the Stewart file was "not logged" when opened by his office after referral from the sheriff's department. Ex. 40, Stroud dep., Stewart v Lee.
In fact the "Bay County Prosecutor's Office Case Review Sheet" expressly states that it was "Not logged." Ex. 41, Bay County Prosecutor Case Review Sheet

g. He did not do an ARMS report because it "[d]oesn't need to have one."[11]

h. He did not do an ARMS report because Cunningham asked him not to.[12]

i. There have been other times Cunningham asked him not to enter a criminal investigation into ARMS, but he cannot remember when.[13]

j. As a matter of practice, interview sheets are typically included in a police report.[14]

k. In the Stewart matter, the interview sheets were not included in the police report.[15]

l. [Although he was the lead investigator in the Stewart matter], he never talked to the prosecutor Stroud.[16]

m. [Although Detective Pett interviewed the primary witness in the Stewart matter, the dentist,] he "do[es] not recall" having a discussion with Pett about the report on his interview of the dentist.[17]

n. He did not interview anyone from the Meijer pharmacy.[18]

o. As to the corrections and staff working in the jail when the Stewart matter occurred, those witnesses were interviewed by Shore.[19]

p. He denies threatening the witnesses with discipline.[20]

q. He "do[e]s not recall" seeing the Weingarten notice posted by Gillis.[21]

150. Defendant Miller testified[22] that the reason no incident report was entered into the ARMS system for the Stewart investigation was because the ARMS system allows department-wide

---

[11] Ex. 25, Shore dep., Gillis v Miller, 25:13
[12] *Ibid.* at 24: 9-11
[13] *Ibid.* at 28:18-22
[14] *Ibid.* at 23:11-21
[15] *Ibid.*
[16] *Ibid.* at 29:13-15
[17] *Ibid.* at 30: 16-25; the dentist, Dr. Ruff, has since testified that he did not make any statements as reported by Det. Pett, and in effect Det. Pett falsified his report to conform to Stewart's story. Dr. Ruff flatly denies authorizing a false prescription for Kim Stewart for subsequent transfer to an inmate at the Bay County jail. Ex..45, Dr. Ruff dep., Walraven v Miller
[18] 24 Ex. 25, Shore dep., p. 19:15-24
[19] *Ibid* at 20
[20] *Ibid* at 20
[21] *Ibid*. at 21:2-9
[22] Ex. 31, Miller dep., Gillis v Miller, p. 18

access and Defendant Miller wanted to maintain confidentiality of the internal criminal investigation.

151. Shore's and Miller's explanation that the reason the Stewart matter was not entered into ARMS because they could not limit access to the investigation is simply untrue, because ARMS allows for the creator and user of any particular case file to limit access of other users to that file.[23]

152. Defendants Miller and Shore did not create police report and case number about the Stewart criminal investigation because they were treating Stewart favorably because he was and is a political supporter of Defendant Miller.[24]

153. Miller did not refer the investigation regarding criminal conduct by Stewart an outside Mission Team, as would be customary when a command officer (or any officer) was suspected of criminal conduct.

154. Miller did not assign a detective to investigate Stewart, but instead assigned a road patrol sergeant (Shore) as lead investigator, who conducted the "investigation" from December 2013 to February 2014.[25]

155. Miller then assigned Detective Pett[26] to interview the critical witness – Dr. Ruff, the dentist.[27]

156. After Pett prepared his report of his interview of Dr. Ruff regarding the Stewart matter, Pett gave the report to Miller, not Shore.[28]

---

[23] *See e.g.,* ARMS User Manual, Unabridged; *See also* Ex. 42, Jarabek dep., pg. 17 ln. 4 – pg. 18, ln. 12 (testifying about the ability to "suppress" reports on ARMS internally.)
[24] At one point during the various lawsuits, Miller simply admitted: "It was kept confidential." Ex. 36, Miller dep., Walraven v Miller, p. 24:24
[25] Ex. 31, Miller dep., p. 18:11-17
[26] Det. Matt Pett is a Miller supporter. Ex. 43, Pett dep., p. 9
[27] *Ibid.* at p. 8:1-5; p. 59:4-6
[28] *Ibid.* at 27:18 – 28:1

4

157. The Pett report[29] of Dr. Ruff's interview states that Dr. Ruff had authorized prescription of the regulated drug to Stewart's wife, knowing and intending that it was going to be given to an inmate whom he had never examined.

158. Pett testified that he then met with assistant prosecutor Brooks, then he and Brooks met with Asbury, who stated that "he didn't feel [the Stewart matter] was a chargeable offense."[30]

159. Pett testified that it "was a month later" that he conversed with Stroud about the Stewart matter.[31]

160. The Pett report was falsified by Pett and Miller to state that Dr. Ruff had somehow condoned the illegal prescription delivery by Stewart, through his wife, to the jail inmate.

161. Later, Dr. Ruff testified that upon review of what Pett stated in his report, it was false and that Dr. Ruff had no knowledge that Stewart and his wife were using him to get prescription for an inmate he had not examined: "I told her that because I hadn't seen the inmate and because he was not a patient of record I would not write a prescription for him."[32]

162. Meanwhile during Shore's investigation of the Stewart matter, Shore conducted a brief set of interviews of corrections officers who may have knowledge or pictures of the prescription drug dropped off in the jail by Stewart.

163. Gillis testified that as local union president, corrections officers Jeff Kerbleski, Wendy Booth, Crystal Backus, Dan Verhagy, and Jeff Vaness approached him about being questioned by Sgt. Shore in the Stewart matter.[33]

164. Gillis testified "they told me they were asked if they'd ever seen the bottle of medication, if anybody was talking about it ... he [Shore] said that if they talked about the issue, that they

---

[29] Ex. 44, Pett report
[30] Ex. 43, Pett dep. p. 32-33
[31] *Ibid.*
[32] *Walraven v. Bay County,* 14-12517, Ex. 45, Ruff dep., p. 6:1-3
[33] Ex. 28, Gillis dep., Gillis v Miller, p. 15:21-25

could be terminated."[34]

165. Gillis testified that Jeff Vaness reported Shore stated "if he had a picture [of the illegal prescription] on his phone, he needs to turn it over, and if he talked about it he could be terminated, or if he didn't cooperate, he could be terminated."[35]

166. Shore's threats to the correction's officers to keep quiet about Stewart's actions were an act in the further of the conspiracy.

167. Shore's entirely "off-the-books" investigation of Stewart at the direction of Miller was a gross deviation from customary police investigatory procedure, and when coupled with his threats to witnesses to keep quiet about Stewart's criminal acts, was conducted in a manner to white wash[36] Stewart's criminal acts.

168. The Stewart white wash and cover-up were acts in furtherance of the conspiracy. Shore's and Miller's commands to corrections employees, to include Lee supporters, to keep quiet about Stewart's actions or risk prosecution[37] because the matter was a "criminal investigation" was merely a pretext to deny the officers their right of free speech about public corruption and deny the officers their right to use that knowledge of public corruption in their political associations.

169. The pretext to silence corrections officers about public corruption was a "criminal investigation" of Stewart, where there were no other indicia of any valid police "criminal investigation," including but not limited to:

    a. the deliberate omission of creating a case number for the investigation as is

---

[34] *Ibid.* at 16:17-22
[35] *Ibid.* 17:5-8
[36] A white wash is a standard procedure of Miller in dealing with his political supporters and opponents. For example, after Miller terminated Holsapple without any pre-termination findings or facts of record (*see* ¶ 137, *supra*), he collected multiple "statements" *post hoc* from co-workers making various allegations about Holsapple's conduct and his alleged derogatory comments about the command. Ex.. 46, Teichel dep., p. 6-8
[37] Threats of discipline by Miller and his command were a common technique to compel employees to act or not act depending on whether it helped or hindered Miller in is political contest with Lee. For example, Deputy Teichel was threatened and actually disciplined in order to compel him to write a statement against Holsapple, a Lee supporter. *Ibid.* p. 15-16

      customarily done,

  b. the deliberate omission of entering the case into the case tracking software and database as is customarily done,

  c. the failure to refer the matter for investigation to a mission team as is customary in the industry,

  d. the deliberate omission of creating and retaining witness statements as is customarily done,

  e. the deliberate omission of the prosecutor to log a case number on referral,

  f. the deliberate omission of the prosecutor to recuse himself,

  g. the lead investigator Shore never interviewed the primary witness, Dr. Ruff, never received the report about Ruff's statements (that was instead given to Miller), and never talked to the prosecutor assigned to the case.

170. Because of the fear instilled into various officers by Shore and their resulting complaints to Gillis, on February 12, 2014, Gillis and Walraven (local union bargaining team member and Lee supporter) drafted and posted a Weingarten notice in the sheriff's department.

171. On February 12, 2014, Miller promptly tore down the posted Weingarten notice as posted by Gillis and threatened Gillis with criminal prosecution for posting the notice.

172. Within two weeks of Miller's threats to Gillis, both Gillis and Walraven were terminated or suspended for pre-textual reasons.